UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

DESIRAE MONIQUE MATA,

Petitioner,

v.

DIRECTOR, TDCJ-CID,

Respondent.

No. 5:20-CV-00086-H
(Consolidated with
No. 5:21-CV-00198-H)

## OPINION AND ORDER

Petitioner Desirae Monique Mata, a state prisoner proceeding with the assistance of counsel, filed a petition for writ of habeas corpus under 28 U.S.C. § 2254, challenging her capital murder conviction and life sentence out of Gaines County. Dkt. Nos . 1, 10. She asserts that she was convicted on the false testimony of a jailhouse informant, which was aided by prosecutorial misconduct and that she received ineffective assistance of counsel at trial. She also alleges that the state habeas court failed to substantively review her claims in violation of due process. She seeks a new trial. Respondent filed an answer with copies of Petitioner's relevant state-court records. Dkt. Nos. 15, 21. Respondent argues that Petitioner's state-process claim is not cognizable and that she failed to otherwise meet her burden for relief under Section 2254. Dkt. No. 21. Petitioner replied. Dkt. No. 26. As explained below, the Court finds that Petitioner is not entitled to federal habeas relief. Her claim that the state habeas court failed to substantively review her claims is contradicted by the record, and in any event, not cognizable under Section 2254. And the state court's summary denial of her claims is entitled to substantial deference. The record here provides a reasonable basis to support the state court's rejection of Petitioner's claims—that the false testimony and withheld evidence were arguably immaterial.

To be sure, the prosecution should have disclosed evidence related to a witness's credibility, but the record as a whole amply supports the state court's denial of her claim. The evidence at Petitioner's trial included the testimony of a jailhouse informant, Angie Brown, who maintained that Petitioner shared details of the crime with her while they were detained in the same cellblock. Brown and her lawyer both averred that Brown was testifying freely and did not expect anything in return. In reality, Brown and her lawyer had repeatedly written to the prosecutor asking him to assist Brown in getting a sentence reduction in exchange for her help. The prosecutor did not disclose these letters to the defense, nor did he correct the misleading testimony. There is no question that the undisclosed letters contained useful impeachment evidence, but the combination of other impeachment evidence against Brown and independent evidence of Petitioner's guilt make clear that the Texas Court of Criminal Appeals (TCCA) could reasonably conclude that the letters were immaterial. The jury heard evidence that other agents of the State—the Texas Rangers—promised to help Brown, and a defense witness contradicted Brown's statement and testified that Brown was known for gathering information to try to get a deal for herself. And, because Brown was not the sole—or even the star—witness who connected Petitioner to the murders, her reliability was not necessarily determinative of Petitioner's guilt or innocence.

Additionally, her counsel's failure to investigate an alternative suspect, who was later identified by her codefendant's trial team, was not constitutionally deficient based on the information available to Petitioner's counsel before her trial. And although counsel admitted that he erred in failing to request a mandatory jury instruction, that error did not prejudice Petitioner.

In short, Petitioner has failed to overcome the difficult, deferential standard of 28 U.S.C. § 2254(d). Thus, the petition is denied and dismissed with prejudice.

## 1.    Background

Petitioner challenges her state-court capital murder conviction and life sentence out of
the 106th District Court of Gaines County, Texas. In cause number 14-4486, styled *State of
Texas v. Desirae Monique Mata*, Petitioner was charged by indictment with two counts of capital
murder for her role in the deaths of John Allen and Jay Doyal. Dkt. No. 15-13 at 10–11.
Petitioner pled not guilty, but a jury found her guilty as charged in the indictment. *Id.* at 324–
27. The State did not seek the death penalty, and the trial court imposed mandatory sentences
of life imprisonment without the possibility of parole. Dkt. No. 15-13 at 324.

### A.    Facts

Petitioner's counsel aptly summarized this case in her appellate briefing. "This case is
about a clique of individuals (mostly criminals) and the consequences of their lifestyles." *See*
Dkt. No. 15-3 at 2; Dkt. No. 15-5 at 2. Petitioner had a child with a drug dealer named Roland
Cantu, nicknamed "Rollie." Dkt. No. 15-3 at 5. One of Rollie's customers stole three diamond
rings and traded them to Rollie in exchange for drugs. *Id.* Petitioner liked one of the rings in
particular and began to refer to it as "my diamond." *Id.* But "[m]uch to [Petitioner's] apparent
consternation, Rollie asked a friend, John Allen . . . to sell all the rings." *Id.*

Allen "was a fence for stolen goods as well as a drug user," and he "believed that the
rings were 'worth a whole lot of money.'" *Id.* Later, Rollie wrote to Allen from prison and
"instructed him to sell the rings and give [Petitioner] '10 g's each' and to take the rest and 'live it
up homie, its all good.'" *Id.* Allen and a friend went to New York City and fenced the
diamonds there, reportedly for $80,000. *Id.* They bought a used Maserati for $20,000 and drove
it back to Seminole. *Id.* at 5–6. After Allen returned to Seminole, Petitioner moved in with
him for a month or two. *Id.* at 6. Rumors spread that Allen had "gotten a good bit of money,
and people began to steal from him." He "became extremely paranoid[,] . . . carried a pistol,

3

wore a body cam[,] and kept a list of people whom he thought had done him wrong." *Id.* He also "installed a surveillance system in his house and . . . boarded up [his] windows." *Id.*

Allen apparently did not pay Rollie or Petitioner with any of the proceeds from the diamond sale. *Id.* at 8. Petitioner expressed her "agitation over the nonpayment of the money [and her] anger over the sale of 'my diamond'" in recorded phone calls with Rollie, who remained in prison.[1] *Id.* About a month before the murders, Petitioner and one of her codefendants—Nicodemes "Dan Dan" Sosa—were captured on Allen's surveillance equipment trying to turn off power to his house. *Id.* at 6.

Later, Petitioner and three of her associates—Juan "Smokey" Castillo, Dan Dan Sosa, and Bobby Ruiz—went to rob Allen at his home. Things went awry, leaving Allen and another man, Jay Doyal, dead. "After the murders, the perpetrators forcibly removed the surveillance recording equipment and took it with them." *Id.* Then, the four friends went their separate ways.

Castillo turned to a friend to "get something off his chest," and told him about the robbery-gone-wrong. *See id.* at 7. He also talked to law enforcement officers. *Id.* In both conversations, he "detailed the crime[,] . . . includ[ing] certain details that the police had intentionally withheld from the public." *Id.* Castillo shared that he went to rob Allen with Bobby Ruiz, Dan Dan, and "Rollie's Desirae."[2] *Id.* at 6–7. He explained that Petitioner knocked on the door while the others waited off to the side. When someone opened the door, "Bobby and Dan Dan rushed in with their pistols drawn, telling Allen that "all they wanted was his safe." *Id.* "[W]ords were exchanged," and things escalated. *Id.* Bobby hit Doyal in the

---

[1] During these phone calls, Petitioner expressed that "people die for diamonds," *see* Dkt. No. 15-20 at 84, and "I want my diamonds. Fuck him. That was bullshit. He would die over diamonds. I don't give a damn." Dkt. No. 15-20 at 91–92.

[2] Castillo identified a different woman—Desirae Reyna—as "Rollie's Desirae," but Ms. Reyna was incarcerated at the time of the murders. *Id.*

4

head with his pistol and shot him in the chest. Dan Dan hit Allen in the head with his pistol. Allen told them to take the safe and leave, but when Allen tried to go toward a back room, Dan Dan shot him twice in the back. *Id.* Castillo reported to both law enforcement and his friend that after the killings, they positioned Doyal's body and placed a meth pipe in his hand to "make it look like the victims were there smoking and 'that somebody did a drive-by.'" *Id.* Investigators tested a DNA sample from the meth pipe and "could not exclude [Petitioner] as a donor." *Id.* at 6.

Meanwhile, Petitioner went to Alabama to visit family after the murders. *Id.* at 7. The day before she was set to return, authorities in Texas obtained arrest warrants for all four suspects. *Id.* That evening, Petitioner canceled her flight home. *Id.* Petitioner was ultimately arrested in Alabama and was held there on these charges for about a week. *Id.* at 2. While in Alabama, Petitioner was incarcerated on the same cellblock as Angie Brown. *Id.* Brown says that Petitioner told her about the murders. *Id.* Brown told her attorney, Rita Briles, what she learned from Petitioner. *Id.* Briles arranged for Brown to meet with Texas Rangers. *Id.* Both Brown and Briles testified at Petitioner's trial. *Id.* Additionally, Briles typed Brown's statement, and it was admitted as an exhibit in Petitioner's trial. *Id.*

Petitioner's habeas claims focus on Brown's testimony as a jailhouse informant.

### B.    Procedural History

The Eleventh Court of Appeals affirmed Petitioner's conviction and sentence in an unpublished opinion. Dkt. No. 15-3. The Eleventh Court found that the trial court erred in failing to instruct the jury on the law requiring corroboration of jailhouse-informant testimony. *Id.* at 4. But the court found the error harmless because, excluding Brown's testimony, the record contained enough other evidence connecting Petitioner to the murders that "the omission of the instruction on corroboration likely had a very minimal effect on the verdict." *Id.* at 8

5

(internal quotation marks and citation omitted).  The TCCA refused Petitioner's petition for discretionary review (PDR).  *See* Dkt. No. 15-12.

Petitioner then filed a state habeas application with an unopposed motion to stay and hold the case in abeyance in the trial court for 90 days while Petitioner gathered transcripts and exhibits from the later trial of a codefendant.  Dkt. No. 21-1 at 16–20.  The trial court granted the stay, *id.* at 23, but the district clerk mistakenly transferred the case to the TCCA before the parties had completed their investigation and briefing in the trial court.  *See* Dkt. No. 15-34.  So the TCCA found that the case was prematurely forwarded and remanded it "to allow the parties and the trial court to complete the proceedings, including an evidentiary investigation and the entry of findings of fact and conclusions of law if appropriate."  *Id.*; *see also* Dkt. No. 15-29.  Petitioner completed her investigation and filed her amended state habeas application on February 3, 2020.  Dkt. No. 15-32 at 7.  The trial court forwarded it, along with a supplemental record, to the TCCA on February 14, 2020.  *Id.*  Public records show that the writ was submitted to the TCCA for review on February 28, 2020.[3]  A couple of months later, on April 15, 2020, the TCCA denied Petitioner's amended habeas application without written order "on the findings of the trial court without a hearing and on the Court's independent review of the record."  Dkt. No. 21-1 at 28.  It is undisputed that the trial court entered no findings or conclusions.

Petitioner filed her first federal habeas petition in this Court on April 20, 2020.  Dkt. No. 1.  Then she returned to state court and filed a suggestion that the TCCA reconsider its disposition of her state habeas application.  Dkt. No. 15-30.  On Petitioner's motion and before Respondent filed an answer, this Court stayed Petitioner's federal habeas petition pending the resolution of her suggestion for reconsideration in the TCCA.  Dkt. No. 7.  Petitioner also filed

---

[3]See https://search.txcourts.gov/Case.aspx?cn=WR-90,058-01&coa=coscca (last visited Feb. 12, 2025).

a second state application for habeas relief. Dkt. No. 21-1 at 32. The TCCA denied in part

Petitioner's second habeas application and dismissed the rest as subsequent. Dkt. No. 21-1 at

34; Dkt. No. 15-35. The same day, the TCCA denied Petitioner's suggestion for reconsideration

of the denial of her first habeas application. Dkt. No. 21-1 at 30.

Then Petitioner returned to this Court and filed a second habeas petition. *See* Dkt. No.

5:21-CV-00198 at Dkt. No. 1. Respondent answered the second petition and provided relevant

state-court records. *Id.* at Dkt. Nos. 6, 7. And Petitioner replied. *Id.* at Dkt. No. 11. The Court

lifted the stay in the first federal habeas proceeding, consolidated the two petitions, and required

amended briefing. *Id.* at Dkt. No. 12; No. 5:20-CV-00086 at Dkt. No. 9. Respondent filed its

amended answer with the required appendix in support. Dkt. No. 21. The state-court records

submitted in the later-filed habeas proceeding were copied into this case at Dkt. No. 15.

Petitioner submitted her reply. Dkt. No. 26.

Petitioner seeks federal habeas relief based on these grounds:

1. She was convicted based on the testimony of a jailhouse informant who falsely
   testified that she was not expecting anything in exchange for her testimony;

2. The state court failed to substantively review the facts underlying Petitioner's claims
   in violation of the Due Process Clause;

3. The state court unreasonably rejected her ineffective-assistance-of-counsel claims
   despite trial counsel's uncontested admissions of deficient performance; and

4. The state court denied her prosecutorial misconduct claims contrary to *Brady v.
   Maryland*, 373 U.S. 83 (1963) and *Kyles v. Whitley*, 541 U.S. 419 (1995), even though
   the prosecutor lied to defense counsel about the jailhouse informant's expectations of
   favorable treatment and misrepresented the informant's expectations to the jury.

Dkt. Nos. 1, 10.[4]

---

[4] Petitioner's grounds for relief are essentially the same in both petitions, except that her second ground
for relief—that the state habeas court violated her right to due process—only appears in her second
habeas petition. Dkt. No. 10.

7

Respondent argues that Petitioner's complaint about deficiencies in the state-court process (Ground Two) is not cognizable under Section 2254 and urges the Court to dismiss it with prejudice. Otherwise, Respondent contends that Petitioner's claims fail to overcome the deferential standard imposed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).

In reply, Petitioner emphasizes her claims that the jailhouse informant lied—and that lie was endorsed by the prosecutor—in violation of her constitutional rights and clearly established Supreme Court precedent. Dkt. No. 26. She also acknowledges that, normally, defects in the state habeas process are not cognizable in a federal habeas proceeding, but she contends that this is not a normal case. She claims that the state habeas court's deviation from its standard procedures was so egregious that it deprived her of all process in violation of her constitutional rights. *Id.* Finally, she reiterates her claim that her trial counsel was ineffective for failing to investigate an alternate suspect and failing to request a mandatory jury instruction on corroboration of jailhouse informant testimony. *Id.*

## 2.    Legal Standard

Section 2254 provides federal courts with a limited, but important opportunity to review a state prisoner's conviction and sentence. *See Harrington v. Richter*, 562 U.S. 86, 103 (2011). This statute, as amended by AEDPA, creates a "highly deferential standard for evaluating state-court rulings, . . . which demands that state-court decisions be given the benefit of the doubt." *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (per curiam) (internal quotation marks omitted).

The basic structure of the federal habeas statute is "designed to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions." *Richter*, 562 U.S. at 103. First, the statute requires that a habeas petitioner exhaust his claims in state court. 28 U.S.C. § 2254(b). If the state court dismisses the claim on procedural grounds, then the

claim is barred from federal review unless the petitioner shows cause and prejudice. *Richter*, 562 U.S. at 103. And if the state court denies the claim on the merits, then AEDPA's relitigation bar applies. *Lucio v. Lumpkin*, 987 F.3d 451, 464–65 (5th Cir. 2021).

Once a state court has rejected a claim on the merits, a federal court may grant relief on that claim only if the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) was "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d); *Adekeye v. Davis*, 938 F.3d 678, 682 (5th Cir. 2019). And "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

A state-court decision is contrary to clearly established federal law if "it relies on legal rules that directly conflict with prior holdings of the Supreme Court or if it reaches a different conclusion than the Supreme Court on materially indistinguishable facts." *Busby*, 359 F.3d at 713. A decision constitutes an unreasonable application of clearly established federal law if "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 413 (2000); *see also Pierre v. Vannoy*, 891 F.3d 224, 227 (5th Cir. 2018) (explaining that a petitioner's lack of "Supreme Court precedent to support" a ground for habeas relief "ends [his] case" as to that ground).

"[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). Federal habeas relief is precluded even when the state court's factual determination is debatable. *Id.* at 303. State-court factual determinations are entitled to

9

a "presumption of correctness" that a petitioner may rebut only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). This "deference extends not only to express findings of fact, but to the implicit findings of the state court." *Ford v. Davis*, 910 F.3d 232, 234–35 (5th Cir. 2018).

State courts need not provide reasons for their decisions, and even summary denials of relief are entitled to substantial deference. *Richter*, 562 U.S. at 100–01. Of course, when the state high court "explains its decision on the merits in a reasoned opinion," then the federal court's review is straightforward—it "simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable." *Wilson v. Sellers*, 584 U.S. 122, 125 (2018). But when reviewing a summary denial, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale." *Id.* If the lower court's rationale is reasonable, the federal court must "presume that the unexplained decision adopted the same reasoning." *Id.* This presumption may be rebutted, however, by evidence that the summary decision "relied or most likely did rely on different grounds." *Id.* at 125–26. And when the lower state court decision is unreasonable, then it is more likely that the state high court's single-word decision rests on alternative grounds. *Id.* at 132.

However, when there is no reasoned state-court decision to look to, then courts "must determine what arguments or theories supported or, . . . could have supported, the state court's decision." *See id.* at 131; *Wooten v. Lumpkin*, 113 F.4th 560, 569 n.7 (5th Cir. 2024) (quoting *Richter*, 562 U.S. at 102). Then, the court determines "whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent" with Supreme Court precedent. *Richter*, 562 U.S. at 102. "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in

10

federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.*

Moreover, "federal habeas relief does not lie for errors of state law," and "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire,* 502 U.S. 62, 67–68 (1991); *West v. Johnson,* 92 F.3d 1385, 1404 (5th Cir. 1996). AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state court convictions are given effect to the extent possible under law." *Bell v. Cone,* 535 U.S. 685, 693 (2002). Federal habeas review is reserved only as a "guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Richter,* 562 U.S. at 102–03. This standard is intentionally "difficult to meet." *Id.*

Additionally, federal habeas review is limited "to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster,* 563 U.S. 170, 181–82 (2011). In short, to overcome AEDPA's highly deferential, difficult standard, a petitioner "must show, based on the state-court record alone, that any argument or theory the state habeas court could have relied on to deny . . . relief was contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court." *Evans v. Davis,* 875 F.3d 210, 217 (5th Cir. 2017).

Finally, even if a petitioner satisfies the onerous requirements of AEDPA, a federal court cannot grant relief unless the petitioner also proves that the state-court error was prejudicial. *Brown v. Davenport,* 596 U.S. 118 (2022). To do so, the petitioner must show that the error was not harmless. In other words, the petitioner must establish that the state-court error had a "substantial and injurious effect or influence" on the verdict. *Brecht v. Abrahamson,* 507 U.S. 619, 622 (1993).

11

## 3.    Analysis

The Court thoroughly examined Petitioner's pleadings, Respondent's answer, the relevant state court records, and the applicable law. The Court finds that an evidentiary hearing is not necessary to resolve the instant petition. *See Young v. Herring*, 938 F.2d 543, 560 n.12 (5th Cir. 1991) ("[A] petitioner need not receive an evidentiary hearing if it would not develop material facts relevant to the constitutionality of his conviction."). As explained below, the Court denies Petitioner's claims.

### A.    Petitioner's state-process claim (Ground Two) is contradicted by the record and is not cognizable under Section 2254.

Petitioner's second ground for relief focuses on irregularities in the state habeas process. Petitioner contends that there was a complete breakdown in her state habeas process. She claims that, after the TCCA remanded the habeas application to the trial court, the trial court never forwarded the record or the case back to the TCCA. Dkt. No. 26 at 26 & n.1. Instead, she says that while "[t]he writ was still pending with the district court, . . . out of left field," the TCCA denied the application, even though it "*was not even pending with the CCA.*" *Id.* at 26 (emphasis original). Then, she emphasizes that the white-card, summary denial referred to the trial court's findings of fact and conclusions of law, even though the trial court never made findings or conclusions.

Petitioner then claims that the TCCA's decision on her successive writ was equally perplexing. She argues that, by denying some of her claims on the merits and dismissing others as subsequent, the TCCA is "trying to have its cake and eat it too, by acting as though the [first] denial exists as to some issues but not as to others." *Id.* at 28. She argues that if the first denial was a true ruling on the merits, then the TCCA should have dismissed her second writ in its entirety. And if it wasn't, then the TCCA should have rescinded the first order and considered

12

all of her claims anew. *Id.* Thus, she argues that throughout the process, the TCCA "departed from its own procedures in an entirely unexpected, unpredictable, and indefensible way." *Id.*

Petitioner faults Respondent for "wholly fail[ing] to acknowledge" the TCCA's procedural short-circuit. *Id.* at 24–25, 27. But Respondent does acknowledge that the TCCA's initial summary denial contains an error—that it refers to findings and conclusions that are not contained in the record. *See* Dkt. No. 21 at 4 & n.2. Otherwise, Respondent lets the record speak for itself.

Contrary to Petitioner's allegations, the records reflect that the trial court did forward the record to the TCCA.[5] *See* No. 5:20-CV-00086 at Dkt. No. 15-32; 5:21-CV-00198 at Dkt. No. 6-32. The records show that Petitioner filed her original state habeas application in the trial court on May 28, 2019, along with a motion to stay the proceedings for 90 days while she continued to investigate and gather records and evidence from the recent trial of one of her codefendants. Dkt. No. 15-33 at 67. The trial court granted the motion, but the case was mistakenly forwarded to the TCCA before Petitioner filed her amended application. Dkt. Nos. 15-33 at 1; 15-34. The TCCA remanded the case to the trial court "to complete the proceedings," including directions that the trial court must resolve fact issues within 150 days (by January 21, 2020) and forward the case back to the TCCA with a supplemental record within 180 days (by February 18, 2020). Dkt. No. 15-34.

---

[5] The Court recognizes that a docketing error in this cause number likely contributed to Petitioner's confusion. The state-court record, comprised of over 2,500 pages in 35 separate attachments, was originally filed in Petitioner's second federal habeas case. *See* No. 5:21-cv-00198 at Dkt. No. 6. When the two cases were consolidated, the state-court record was copied into the lead case, No. 5:20-cv-00086 at Dkt. No. 15. But attachment no. 32—the trial court's 69-page supplemental e-record in Petitioner's first state habeas writ, No. WR-90,058-01—was inadvertently omitted and replaced with a duplicate of attachment no. 31. That error has been corrected, and the parties were notified of the change. However, the Court notes that Petitioner's counsel was also counsel of record in the second federal habeas case as well as in Petitioner's state habeas proceedings. Thus, the Court finds that counsel had access to the complete state-court record throughout this pending proceeding and had personal, real-time knowledge of the state-court proceedings.

13

The trial court entered its certification that there were no controverted, unresolved material facts just days before the TCCA's deadline, and before Petitioner filed her promised amended application. Dkt. No. 15-32 at 6. Petitioner did not file her amended state habeas application until three weeks later, on February 3, 2020. Dkt. No. 15-32 at 7. In response, the State filed its general denial on February 13, 2020, Dkt. No. 15-25, and the supplemental record of the case was prepared and forwarded to the TCCA the same day. *See* Dkt. No. 15-32. The case was received by the TCCA just one business day before the deadline. *Id.* Two months later, the TCCA denied the application without written order "on the findings of the trial court without a hearing and on the Court's independent review of the record." Dkt. No. 21-1 at 28. It is undisputed that the trial court entered no findings or conclusions.

Although the TCCA's summary denial contains a mistake—referring to findings that the trial court never entered—the record contradicts Petitioner's assertion that the TCCA acted "out of left field" in a case that was never submitted to it. To the contrary, the record shows that the trial court forwarded the case and supplemental records according to the timeline imposed by the TCCA—even with Petitioner's last-minute, tardy amendment. The case was properly submitted to the TCCA, and its summary denial is entitled to substantial deference—despite the clerical error. *See Richter*, 562 U.S. at 100–01.

Likewise, there is nothing improper or unexpected about the TCCA's determination on Petitioner's subsequent state writ. The Texas Code of Criminal Procedure prohibits the state court from considering the merits of a subsequent habeas application unless the applicant establishes that the issues could not have been presented previously because the factual or legal basis for the claim was unavailable when the first habeas application was filed. Tex. Code Crim. P. art. 11.07 § 4. Petitioner states that she filed her subsequent writ after obtaining previously sealed documents from the jailhouse informant's federal criminal proceedings showing that the informant received a sentence reduction based on her testimony against

14

Petitioner. Dkt. No. 26 at 21. She attached this newly discovered evidence to her second state writ. *Id.* And, although she re-urged some of her other claims, it does not appear that she attached any newly discovered evidence or argument related to those claims. The TCCA considered Petitioner's subsequent jailhouse informant claims based on her newly discovered evidence and denied them on the merits. Dkt. No. 15-35. But it dismissed her other claims, expressly finding that they did not satisfy the requirements of art. 11.07 § 4. *Id.* Thus, the state court's order on Petitioner's subsequent writ was entirely consistent with its own procedure.

The record reveals that the state habeas process here was far from the outrageous, extreme deprivation of process she describes. Indeed, the only irregularity shown in the record is the TCCA's clerical error in referring to the trial court's nonexistent findings. But as argued by the respondent, it is well established that alleged errors in a state habeas proceeding do not state a claim for federal habeas corpus relief. *Vail v. Procunier*, 747 F.2d 277 (5th Cir. 1984). The Fifth Circuit has repeatedly confirmed that "an attack on the state habeas proceeding is an attack on a proceeding collateral to the detention and not the detention itself." *Rudd v. Johnson*, 256 F.3d 317, 320 (5th Cir. 2001) (collecting cases). Thus, Petitioner's state-court process claim (Ground Two) is contradicted by the record and, in any event, is not actionable under Section 2254.

## B.    Petitioner failed to overcome AEDPA's relitigation bar with respect to her jailhouse-informant claims (Grounds One and Four).

Petitioner fairly presented her jailhouse-informant claims to the TCCA in her state habeas applications. The TCCA's summary denial of these claims was a decision on the merits[6] and is entitled to substantial deference. *Richter*, 562 U.S. at 100–01. The Court must first

---

[6] In Texas writ jurisprudence, a "denial" signifies that the state high court "addressed and rejected the merits of a particular claim," but a "dismissal" means that the court "declined to consider the claim for reasons unrelated to the claim's merits." *Ex parte Torres*, 943 S.W.2d 469, 472 (Tex. Crim. App. 1997); *Barrientes v. Johnson*, 221 F.3d 741, 780 (5th Cir. 2000).

15

determine what arguments or theories supported or could have supported the state court's decision, then determine whether it is possible fairminded jurists could disagree that those arguments or theories conflict with Supreme Court precedent. *Wilson*, 584 U.S. at 131; *Richter*, 562 U.S. at 102.

### i. Background

Petitioner's first and fourth grounds for relief revolve around Brown's testimony as a jailhouse informant. Before her trial, Petitioner's lawyer asked the Gaines County District Attorney, Michael Munk "whether he was going to do anything to help Brown out with her federal sentence in exchange for her testimony." Dkt. No. 15-24 at 68. But Munk "assured [him] that there was no deal or expectation of a deal with Brown that he knew about." *Id.*

At Petitioner's trial, Brown testified that no one told her she would get "any kind of favorable deal" in exchange for her testimony. Dkt. No. 15-18 at 105. She admitted that after she was sentenced in her federal criminal case, she wrote a letter to Texas Ranger Brian Burney asking him to "keep his promise," but clarified that Munk had not made her any promises. *Id.* at 110. Additionally, Brown's attorney, Rita Briles, testified that nothing was "communicated to [Brown] that she would gain some advantage or lose something if she didn't make the statement." Dkt. No. 15-17 at 188. And Briles confirmed that, as far as she knew, Brown "was making this statement freely and of her own will." *Id.*

In his closing argument, Munk recalled Brown's testimony. He questioned whether "Ms. Brown's testimony is less credible because possibly detectives might have suggested some kind of deal." Dkt. No. 15-20 at 89–90. But he stated, "I don't know anything about that. You heard her testify. 'Not that man sitting right there,' . . . I didn't make her any deal." *Id.* He then asks "what difference does it make whether a deal was offered?" *Id.* at 90.

16


Case 5:20-cv-00086-H   Document 27   Filed 03/12/25   Page 18 of 37   PageID 2816

ultimately received a 60-month sentence reduction based on her assistance in the investigation and prosecution of Petitioner and her codefendants. *Id.* at 63.

After the letters were disclosed, Brown testified in the trial of Petitioner's codefendant Bobby Ruiz. There, she admitted that she and her attorney were "trying to get a deal" for the information she provided against Petitioner. Dkt. No. 15-32 at 37. She also agreed that her attorney wrote to Munk "trying to get some help for . . . Brown" and that she "want[ed] some consideration for the[] notes" she shared. *Id.* at 38–39. She testified that she felt entitled to something in return for her testimony. *Id.* at 40. But she confirmed that Munk did not write her any letters back in 2013, impliedly because she "hadn't closed the deal." *Id.*

Based on these facts, Petitioner argues that Munk wrongfully withheld the letters to conceal Brown's incentive to testify, and he allowed Brown (and Briles) to lie to the jury about her incentivized testimony. Petitioner also argues that she would not have been convicted but for Brown's testimony, and the jury "would have treated the testimony differently" had it known that "several years of freedom for Brown hung on her testimony." Dkt. No. 26 at 20.

### ii.   Relevant legal standards

"The Due Process Clause of the Fourteenth Amendment forbids the government from knowingly using, or failing to correct, false testimony." *United States v. Mason*, 293 F.3d 826, 828 (5th Cir. 2002) (citing *Giglio v. United States*, 405 U.S. 150 (1972) and *Napue v. Illinois*, 360 U.S. 264 (1959)). To establish a due-process violation, a petitioner must prove that (1) a witness testified falsely, (2) the government knew the testimony was false, and (3) the testimony was material. *Id.* Evidence may be considered false if it is misleading and important to the prosecution's case. *Nobles v. Johnson*, 127 F.3d 409, 415 (5th Cir. 1997) (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974). False testimony is material if there is "any reasonable

18

likelihood" that it "could . . . have affected the judgment of the jury." *Uvukansi v. Guerrero*, 126 F.4th 382, 390 (5th Cir. 2025) (quoting *Giglio*, 405 U.S. at 154; *Napue*, 360 U.S. at 271).

Prosecutors have a well-established duty to disclose favorable evidence for purposes of ensuring a fair trial. *Brady*, 373 U.S. 83. It does not matter whether the favorable evidence is exculpatory or impeaching. *See United States v. Bagley,* 473 U.S. 667, 676 (1985). "When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility" requires a new trial. *Giglio*, 405 U.S. at 153–54 (quoting *Napue*, 360 U.S. at 269). But a new trial is not automatically required when prosecutors fail to disclose "evidence possibly useful to the defense but not likely to have changed the verdict." *Id.*

A successful Brady claim must show three essential elements: (1) the evidence was favorable to the accused, (2) the evidence was withheld by the State, and (3) the withholding prejudiced the accused. *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). To show prejudice, the evidence must be material. In other words, the nondisclosure must be "so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Id.*; *see also Banks v. Dretke*, 540 U.S. 668, 688 (2004) (explaining that, to satisfy the materiality requirement, a petitioner must show a "reasonable probability of a different result").

The materiality inquiry "is not a sufficiency of evidence test." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). "The question is not whether [Petitioner] would more likely than not have received a different verdict" if the letters were disclosed before trial, but whether she "received a fair trial . . . resulting in a verdict worthy of confidence." *Id.* Accordingly, a "'reasonable probability' of a different result" can be shown if the withheld evidence "undermines confidence in the outcome of the trial." *Id.* (citing *Bagley,* 473 U.S. at 678)).

### iii.    Discussion

#### a.    Falsity and Favorability

Respondent argues that the state court reasonably rejected Petitioner's jailhouse-informant claims because Petitioner failed to show that Brown's testimony was false. But testimony, even "if not outright lies," may be considered false if it "conveyed [a] false impression" to the jury that the witness had no expectation of leniency or other motivation for testifying. *United States v. Barham*, 595 F.2d 231, 241–42 (5th Cir. 1979). And it does not matter whether the prosecutor consciously solicited the false or misleading testimony or simply failed to correct it. *Id.*

Notably, Respondent does not dispute that the letters between Briles, Brown, and Munk were withheld from defense counsel. Nor do they dispute that the evidence was favorable. Indeed, evidence that a government witness is seeking a sentence reduction in exchange for testifying "provide[s] fertile grounds for impeachment." *Uvukansi*, 126 F.4th at 385. Respondent instead emphasizes that, even with the letters, "nothing shows that a deal was in fact in place with the District Attorney's office at the time of [Petitioner's] trial." Dkt. No. 21 at 13. But even in the absence of a "firm promise," the State is required to disclose evidence of a witness's incentive to testify. *See Tassin v. Cain*, 517 F.3d 770, 778–80 (explaining that a witness's expectation of potential favors in exchange for testimony need not be a "firm promise" to trigger *Brady*, because "the crux of a Fourteenth Amendment violation is deception"); *see also Bagley*, 473 U.S. at 683 (explaining that the "possibility of a reward" gave witnesses "a direct, personal stake" in obtaining a conviction, and "[t]he fact that the stake was not guaranteed through a promise or binding contract, but was expressly contingent on the Government's satisfaction with the end result, served only to strengthen any incentive to testify falsely in order to secure a conviction").

Thus, assuming that Brown's testimony was false and that the undisclosed letters were favorable, the Court must consider whether the evidence was material—or whether a finding that the evidence was immaterial could have reasonably supported the state court's decision.

### b.   Materiality

First, for Petitioner's false-testimony claim, the Court must determine whether there is "any reasonable likelihood" that the false or misleading testimony could have affected the judgment of the jury. Then, for Petitioner's *Brady* claim, the Court must consider whether there is a reasonable probability that disclosure of the letters would have produced a different result. Ultimately, the Court must determine "whether it is possible fairminded jurists could disagree" that a finding of immateriality conflicts with Supreme Court precedent. *Richter*, 562 U.S. at 102. Relief is not warranted unless the state court's conclusion was so wrong that there is no room for disagreement. *Id.*

Petitioner argues that Brown was the State's "star witness." Dkt. No. 26 at 22. She contends that "[t]ruly, the only glue that held together the State's case against Petitioner was Brown," *id.* at 13, and that "Brown is the only person putting [Petitioner] at the scene of the crime," *id.* at 20. Thus, she argues that Brown's false testimony and the State's withholding of "horribly damaging impeachment evidence" was clearly material. *Id.* at 20, 22.

Of course, "false credibility testimony may be material." *Uvukansi*, 126 F.4th at 391 (citing *Napue*, 360 U.S. at 269). But the fact that the false evidence only affects credibility—rather than false inculpatory testimony—may be considered "as a factor in judging its materiality." *Id.* And nothing forbids courts from considering whether the force of the false testimony is "diminished by later testimony impeaching [the witness's] credibility." *Id.* Here, there was other testimony impeaching Brown's credibility. First, Brown herself testified that before Petitioner's trial, she wrote a letter to Texas Ranger Burney asking him to "keep his

21

promise." Dkt. No. 15-18 at 110. Indeed, in the letter referenced by Petitioner's counsel, Brown asked Ranger Burney to "do what you agreed to do to help me."[7] Dkt. No. 15-24 at 48. The letter and the potential promise were mentioned again by both the prosecutor and Petitioner's counsel in closing arguments. Dkt. No. 15-20 at 60, 89–90.

The defense also impeached Brown's testimony with the testimony of another Alabama jail inmate, Bella Cowan, who was housed on the same cellblock as Petitioner and Brown. Dkt. No. 15-19 at 9–57. Brown testified that Bella "came in during the conversation" while Petitioner allegedly shared the details of the crime with Brown. Dkt. No. 15-18 at 100. But Bella testified that Brown was lying—she never walked in on any conversation between Petitioner and Brown. Dkt. No. 15-19 at 14. Bella said that no such conversation would not have happened because she "warned" Petitioner about Brown when she came into the jail. *Id.* at 14 & 46. Bella explained that Brown was known in the Alabama jail for "ear hustling"—that she was "very nosy," *id.* at 46, and "liked to try to find out things about your case," *id.* at 11. She also described how Brown "would call her folks on the phone and she would ask them to google" to find out information about other inmate's cases. *Id.* at 14. Bella testified that if she had heard any of the information about Petitioner's case that Brown says she heard, she would have "gone to the authorities" to "get a deal." *Id.* at 24, 31. So, Bella speculated that Brown "may have ear-hustled on some things that [Petitioner] and I talked about and concocted her own little version of events." *Id.* at 49.

Despite Petitioner's framing of the importance of Brown's testimony, the record does not depict her as the State's star witness. During the trial, Munk emphasized that "[t]here would

---

[7] Although Petitioner's counsel referred to the letter, and Brown confirmed both that she wrote the letter and that she asked Burney to keep his promise, the letter was not admitted at Petitioner's trial. *See* Dkt. No. 15-18 at 116–17.

have been a case with or without Angie Brown's testimony." Dkt. No. 15-20 at 89. In his closing argument, he asked the jury to consider all the evidence together. *Id.* at 81–82. Munk also addressed Brown's credibility. He recognized that the defense was "trying to discredit Ms. Brown's testimony by saying it's a complete fabrication or she was ear-hustling or she heard about this in the Shelby County news." *Id.* at 85. And he acknowledged the implication that "Brown's testimony is less credible because possibly detectives might have suggested a deal." *Id.* at 89–90. Munk asked "what difference does it make whether a deal was offered?" He focused his argument on the consistent details across Brown's inculpatory testimony and other evidence in the record, including the statements of Petitioner's codefendant and other witnesses.

And although there is no reasoned state-court opinion addressing Petitioner's habeas claims, the opinion of the Eleventh Court of Appeals on Petitioner's direct appeal also provides some helpful insight. Specifically, the appellate court found that even "excluding Brown's testimony, the evidence . . . tended to connect [Petitioner] to the murders." Dkt. No. 15-3 at 7. The court then summarized the other evidence:

> [W]hen we read the entire transcripts of the jail phone calls between Rollie and Appellant, we find that there was a good bit of testimony that showed Appellant's agitation over the nonpayment of the money, in addition to anger over the sale of "my diamond." Appellant lived with Allen for a time and would have been familiar with his paranoia, his safe, and his surveillance equipment. Appellant could not be excluded as a contributor of DNA to the meth pipe that was purposefully placed in Doyal's hands after he was dead. Appellant and Rollie had lived together and were the parents of a young boy. There was testimony that "Rollie's Desirae" was the fourth person involved in the killings and that she was the one to gain access to Allen's house on the date of the murders. The only other "Desirae" connected to Appellant was Desirae Reyna, and she was in jail on the date that the murders took place. Appellant had reservations to return to Texas from Alabama the day after an arrest warrant was issued for her in Texas. After the Texas warrant was issued, Appellant canceled that return flight.

23

*Id.* Notably, the Eleventh Court underscored that they were not reviewing the record for sufficiency of the evidence. *Id.* Rather, they were considering the effect, if any, of the omission of a jury instruction on corroboration of jailhouse-informant testimony. Ultimately, the appellate court found that "because of the corroborating evidence in the record," the failure to instruct the jury on corroboration "likely had very minimal effect on the verdict." *Id.* at 8.

In light of the record, the state court could have reasonably determined that the false credibility evidence was immaterial. The force of the false testimony is diminished by the introduction of other impeachment evidence. The jury heard other evidence suggesting that Brown was expecting help from the Texas Rangers. And it heard testimony that Brown was untrustworthy—that she often searched for information about other inmates' cases to leverage. There was also other impeachment evidence—contradicting her claim that Bella witnessed part of the conversation between Petitioner and Brown. And the TCCA could have reasonably determined, like the Eleventh Court of Appeals did, that even "excluding Brown's testimony," the evidence . . . tended to connect [Petitioner] to the murders." Dkt. No. 15-3 at 7.

After hearing the evidence, the jury could have determined that Brown was credible despite the evidence of Brown's potential motive for testifying and other impeachment evidence because, as argued by Munk, the details in her statement were largely consistent with the other evidence in the case. Or the jury might have determined, based on the other impeachment evidence before them, that Brown was not credible but convicted Petitioner on the totality of other evidence connecting her to the murders. Either way, the TCCA could have reasonably concluded that, in light of the impeachment evidence introduced at trial, and the other evidence connecting Petitioner to the murders, there was no reasonable likelihood that the false testimony could have moved the needle enough to affect the judgment of the jury.

24

Likewise, the state court could have reasonably determined that the withheld letters were not material for purposes of Petitioner's *Brady* claim. The suppressed letters show only that Brown was expecting or hoping for favorable treatment. They do not establish that Munk made any promises, agreements, or even responded to Brown's requests. Brown's testimony may have been false even without a firm agreement in place, but the fact that her expectation was one-sided affects the weight of the evidence. As a whole, the letters show that Brown asked both the Texas Rangers and Munk to contact the U.S. Attorney on her behalf. And as discussed above, the jury heard about Brown's potential deal with the Texas Rangers. The fact that she also asked Munk for his help in seeking a sentence reduction does not tip the scale all that much. In light of the totality of the evidence, as discussed above, the TCCA could have reasonably determined that there is not a reasonable probability that the suppressed letters would have produced a different verdict. In other words, the content of the letters and their nondisclosure are not so egregious that they undermine confidence in the verdict.

In sum, fairminded jurists could reasonably find that the evidence was immaterial without conflicting with established Supreme Court precedent. *Richter*, 562 U.S. at 102. "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* Petitioner has not pointed to any Supreme Court case reaching the opposite conclusion on a set of materially indistinguishable facts, and the Court has found none.

This case is distinguishable from *Napue*, where the State's star witness—a codefendant by the name of Hamer—falsely testified that nobody promised to help him get a sentence reduction if he testified. *Napue*, 360 U.S. 264. In fact, the prosecutor had promised to recommend a sentence reduction for Hamer in exchange for his testimony. The Supreme Court described Hamer's testimony as "extremely important" because of the passage of time and the

25

unavailability of other witnesses. So, the evidence against Napue "consisted largely" of Hamer's testimony. Hamer admitted that a public defender had offered to do what he could to help, but the Supreme Court found that this insignificant admission did not render his false testimony immaterial—had the jury known that the prosecutor had cut a deal with him, it would have "put the testimony in a substantially different light." *See Uvukansi*, 126 F.4th at 391 (discussing *Napue*).

Here, in contrast, multiple facts lead the Court to the opposite conclusion. First, Brown's testimony was not the sole—or even the primary—evidence connecting Petitioner to the crime. Brown's statement was corroborated by statements of Petitioner's codefendant, Juan Castillo, and supported by physical evidence at the scene, including her DNA on the meth pipe intentionally positioned in one of the victims' hands after the killings. Moreover, her recorded phone calls provided motive and context, and her preliminary attempt to disable the victim's cameras with Dan Dan also connect her to the crime. Additionally, the false evidence is substantially less forceful here. The undisclosed letters establish only that Brown asked the prosecutor to help her get a sentence reduction—not that he had agreed to do so. And the jury heard evidence suggesting that other agents of the State—the Texas Rangers—had promised to help her. Finally, there was other impeachment evidence, including the testimony of a different inmate that contradicted parts of Brown's statement and described her reputation for "ear hustling" to try to get a deal for herself. Given that Brown's testimony was less important to the State's overall case against Petitioner, and her false testimony less forceful than that in *Napue*, the Court cannot fault the state court for reaching a different conclusion.

Newer case law also supports the Court's analysis. The Supreme Court recently granted habeas relief based on egregious—and admitted—violations of *Napue* and *Brady*. *Glossip v. Oklahoma*, 604 U.S. ___, 2025 WL 594736 (Feb. 25, 2025). There, the State withheld eight

26

boxes of evidence showing that its primary witness suffered from bipolar disorder, for which he was prescribed lithium. The State then failed to correct the witness's false trial testimony that he had never seen a psychiatrist and had been inadvertently given lithium instead of cold medicine. Because the witness's testimony was the only direct evidence of the Glossip's guilt, the jury's assessment of his credibility was "necessarily determinative"—"no other witness and no physical evidence established" Glossip's guilt. Moreover, the undisclosed evidence directly undermined other components of the State's case, including its repeated theory that the witness was harmless on his own and only participated in the killing at Glossip's direction.

Again, Petitioner's case is easily distinguishable from the egregious, material, and admitted violations described in *Glossip.* Brown did not supply the only evidence of Petitioner's guilt. As the Eleventh Court found, even excluding Brown's testimony, there was ample other evidence in the record connecting Petitioner to the murders. As a result, the jury's determination of Petitioner's guilt did not depend on Brown's credibility.

Finally, although not determinative here, the Court finds recent new Fifth Circuit cases instructive. Last week, a split panel of the Fifth Circuit granted habeas relief in a capital murder case after finding that the State "failed to disclose impeachment evidence that its critical trial witness was a paid informant." *Holberg v. Guerrero*, No. 21-10010, slip op. at 1 (5th Cir. Mar. 7, 2025). In that case, it was undisputed that Holberg killed the victim—the only issue was whether she killed him in self-defense or whether she killed him callously while robbing him. *Id.* The informant's testimony was the State's only testimonial account of the violent encounter and the only evidence suggesting that Holberg "took pleasure in the gruesome act." It also reinforced the State's robbery theory—that Holberg killed the victim to get his money and to get drugs. The informant's testimony provided the primary basis for the penalty-phase finding of future dangerousness required to impose the death penalty. In short, Holberg's trial hinged on

27

the informant's credibility, and without the suppressed evidence, the defense had nothing with which to impeach her. The majority concluded that, on the record of that case, and in light of the informant's role as a key witness who supplied direct evidence of the robbery element of the capital murder offense, "there is no sound theory . . . to support the conclusion that [the suppressed evidence] did not reasonably affect Holberg's trial."

Once again, Petitioner's case is immediately distinguishable because Brown's testimony was corroborated by a range of other evidence in the record—she did not provide the sole basis for any element of Petitioner's conviction. She was not the State's key witness. And the jury heard other evidence diminishing Brown's credibility, including evidence of her potential motivation for testifying. The facts in Petitioner's case are nowhere near as extreme as those depicted in *Holberg*, and the testimony of the informant was not nearly as important.

In another capital murder case, *Uvukansi*, 126 F.4th 382, the sole identification witness falsely testified that he had no agreement with prosecutors regarding his testimony, when in fact, he did have an agreement. There, the Fifth Circuit found that the witness's testimony was "[u]ndoubtedly . . . critical to the State's case." *Id.* at 385. But because the jury heard about parts of the agreement from another witness, the state court was not unreasonable in concluding that the false evidence was immaterial. Here, similarly, a finding of immateriality reasonably supports the state court's rejection of Petitioner's claims because the jury heard other evidence suggesting that Brown hoped to get a deal from her testimony.

These cases underscore the balance between "the necessity of ensuring fair and just trials," *Weaver v. Mass.*, 582 U.S. 286, 305 (2017), and the "principles of comity, finality, and federalism" that prevent federal courts from disrupting state-court judgments except in the most egregious cases. *See Uvukansi*, 126 F.4th at 392. This is not such an extreme case. It is not "'beyond the realm of possibility that a fairminded jurist could' agree with the state court."

28

*Langley v. Prince*, 926 F.3d 145, 156 (5th Cir. 2019) (quoting *Woods v. Etherton*, 578 U.S. 113, 117 (2016)). The state court could have reasonably determined that Petitioner received a fair trial, resulting in a verdict worthy of confidence.

Stated differently, the TCCA's summary denial of Petitioner's false-evidence and withheld-evidence claims was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* It is possible that fairminded jurists could disagree about whether the evidence was material. But under Section 2254, the Court cannot disturb a state-court judgment if there is any room for disagreement. In other words, because it is debatable, relief under Section 2254 is precluded. *Richter*, 562 U.S. at 103. As a result, Petitioner is not entitled to habeas relief on these grounds.

## C. Petitioner failed to overcome the doubly deferential AEDPA standard on her ineffective-assistance-of-counsel (IAC) claims.

Finally, in her third ground for relief, Petitioner argues that her trial attorney was constitutionally ineffective because he failed to (1) investigate a viable alternative suspect, and (2) request a mandatory jury instruction.

The well-known standard applicable to IAC claims is set out in *Strickland v. Washington*, 466 U.S. 668, 689 (1984). Under the two-pronged *Strickland* test, a petitioner must show that counsel's performance was both deficient and prejudicial. *Id.* at 687. An attorney's performance was deficient if the attorney made errors so serious that the attorney was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. *Id.* That is, counsel's performance must have fallen below the standards of reasonably competent representation as determined by the norms of the profession.

A reviewing court's scrutiny of trial counsel's performance is highly deferential, with a strong presumption that counsel's performance falls within the wide range of reasonable

29

professional assistance. *Id.* at 689. A strong presumption exists "that trial counsel rendered adequate assistance and that the challenged conduct was reasoned trial strategy." *Wilkerson v. Collins*, 950 F.2d 1054, 1065 (5th Cir. 1992) (citing *Strickland*, 466 U.S. at 694).

Additionally, a petitioner must show that counsel's deficient performance prejudiced the defense. To establish this prong, a petitioner must show that counsel's errors were so serious as to deprive petitioner of a fair trial. *Strickland*, 466 U.S. at 687. Specifically, a petitioner must show "(1) there is a reasonable probability that, but for counsel's unprofessional errors, the ultimate result of the proceeding would have been different . . . and (2) counsel's deficient performance rendered the trial fundamentally unfair." *Creel v. Johnson*, 162 F.3d 385, 395 (5th Cir. 1998). "Unreliability or unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). This is a heavy burden that requires a "substantial," and not just a "conceivable," likelihood of a different result. *Richter*, 562 U.S. at 112; *see also Pinholster*, 563 U.S. at 189.

In the context of Section 2254(d), the deferential standard that must be given to counsel's representation must also be considered in tandem with the deference that must be given to state-court decisions, which has been called "doubly" deferential. *Richter*, 562 U.S. at 105. "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* Additionally, if a petitioner fails to show either the deficiency or prejudice prong of the *Strickland* test, then the Court need not consider the other prong. *Strickland,* 466 U.S. at 697.

30

### i.     Alternative suspect

First, Petitioner claims that her counsel was ineffective when he failed to investigate an alternative suspect. Dkt. No. 26 at 30–32. She points to the affidavit prepared by Petitioner's trial counsel. In it, counsel asserts that in his initial meeting with Petitioner, she told him that the night of the murders, or early the next morning, her codefendant Nicodemes Sosa (Dan Dan) came to her house with another man, and the two men argued over something. Dkt. No. 15-24 at 66.  Petitioner also asserts that her counsel received discovery including DNA reports from various items found at the crime scene. Dkt. No. 26 at 31.  She claims that one of those reports named Jerry Castillo[8] as a contributor to DNA found on a lighter at the victim's house. Petitioner contends that trial counsel should have connected the dots and investigated whether Jerry Castillo is the man who argued with Sosa at Petitioner's house.

She explains that Petitioner's codefendant Bobby Ruiz's trial team did just that.  Ruiz hired an investigator, who found Jerry Castillo and talked to him.  Ruiz also requested more DNA testing, which confirmed that Jerry's DNA was on multiple items at the crime scene. Ruiz's trial team developed a theory that Dan Dan and Jerry committed the murders, and Petitioner, Ruiz, and Juan Castillo were not there.  *See* Dkt. No. 15-24 at 76–78.  Petitioner claims that if her trial counsel had investigated like Ruiz's attorneys did, she would have been able to offer the jury a viable alternative story to undermine the State's narrative.  She argues that counsel's failure to investigate was deficient and that the outcome of her trial would have been different absent counsel's failure to investigate.

The Supreme Court has recognized that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations

---

[8] It appears that Jerry Castillo is not related to Petitioner's codefendant, Juan Castillo. *See* Dkt. No. 15-24 at 75.

31

unnecessary." *Strickland*, 466 U.S. at 691. But the reasonableness of counsel's investigation decisions depends substantially on the information provided by the defendant. *Id.* "Defense counsel is not required 'to investigate everyone whose name happens to be mentioned by the defendant.'" *Schwander v. Blackburn*, 750 F.2d 494, 500 (5th Cir. 1985) (quoting *United States v. Cockrell*, 720 F.2d 1423, 1428 (5th Cir. 1983).

Petitioner has not shown that the TCCA's rejection of this claim was unreasonable. Here, trial counsel represented that Petitioner gave him very little information about the mystery man who came to her house and argued with Sosa. Dkt. No. 15-24 at 66. Not only did Petitioner not know the identity of the other man, but she reportedly did not know any details about the men's argument. *Id.* Petitioner's counsel explains that he learned of the codefendant's mysterious argument with the unknown man during his initial meeting with Petitioner, early in the case. *Id.* And, at the time, he knew that the police were looking into a different suspect, Thomas May, who was later ruled out. *Id.* With so little information to go on, it is unsurprising that counsel opted to chase down other leads instead.[9]

Nor is it unreasonable that counsel allegedly failed to follow up on a DNA report identifying Jerry Castillo as a possible contributor to DNA found in the victim's house. As detailed above, this case centers on a subculture of drug users and criminals in Seminole, Texas. Petitioner's DNA was found on the meth pipe placed in one of the victim's hands. Her codefendant Bobby Ruiz's DNA was found on a lighter, along with the DNA of three other individuals.[10] The presence of DNA from other known criminals or drug users on drug paraphernalia found at the victim's house was not surprising.

---

[9] For example, trial counsel investigated to identify the other inmate mentioned in Brown's statement—and her testimony at trial helped impeach Brown's otherwise damaging statement. *See* Dkt. No. 15-20 at 73–74.

[10] *See Ruiz v. State*, No. 11-18-00267-CR, 631 S.W.3d 841, 848 (Tex.App.—Eastland, 2021).

Finally, the Court is mindful of the Supreme Court's directive that "a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 669. The affidavit of Ruiz's investigator makes clear that he zeroed in on Jerry Castillo based on information learned after Petitioner's trial, not from any DNA report provided in discovery or from any vague mention of a mysterious argument with an unknown man. Dkt. No. 15-24 at 74. Instead, Ruiz's investigator had something that Petitioner's attorney did not—the statement of Nicodemes Sosa (Dan Dan), given to his attorneys after he pled guilty in the double homicide. But that statement did not exist when Petitioner's attorney was preparing for her trial. Counsel need not be clairvoyant to be effective. Based on the scant information available to Petitioner's counsel during his investigation of her case, his failure to identify and investigate Jerry Castillo as an alternative suspect was not constitutionally deficient.

## ii.  Jury instruction

Second, Petitioner claims that her counsel was ineffective for failing to request a jury instruction on corroboration of jailhouse-informant testimony. Texas law requires that jailhouse-informant testimony be corroborated by other evidence connecting the defendant with the offense committed. Dkt. No. 25-3 at 3–4 (citing Tex. Code Crim. P. art. 38.075). The Eleventh Court of Appeals determined that the trial court erred by failing to instruct the jury in accordance with this law. *Id.* Likewise, the Court assumes that counsel's failure to request the mandatory instruction was deficient. Counsel admits as much in his affidavit. Dkt. No. 15-24 at 71.

But Petitioner cannot show that she was prejudiced by counsel's failure. As explained by the Eleventh Court of Appeals, because there was plenty of corroborating evidence, "the

33

omission of the instruction on corroboration 'likely had a very minimal effect' on the verdict. The omission . . . did not affect the very basis of this case, deprive [Petitioner] of a valuable right, or vitally affect a defensive theory." Dkt. No. 15-3 at 8 (internal citation omitted). For the same reason, the state court could have reasonably determined that Petitioner was not prejudiced by counsel's failure to request the instruction.

In sum, there are reasonable arguments to support a finding that counsel satisfied Strickland's requirements. Giving appropriate deference both to counsel's performance and the state court' decision, the Court concludes that Petitioner is not entitled to relief on her IAC claims.

### D. Petitioner has not overcome *Brecht*'s harmless-error standard.

On top of analyzing a petitioner's claims under the difficult, deferential AEDPA standard, "where *Brecht* is implicated a federal court must also ensure a habeas petitioner has carried his burden under its terms." *Brown*, 596 U.S. at 127 (2022).[11] All of Petitioner's substantive habeas claims required the Court to determine the effect, if any, of the alleged errors on the jury's verdict. Petitioner has failed to identify any error that had a substantial and injurious effect on the outcome. Indeed, Petitioner relies considerably on evidence discovered by her codefendant, Bobby Ruiz's attorneys. The record establishes that Petitioner and Ruiz's defenses were aligned—under any theory presented, either they both participated in the murders, or neither of them was present. Dkt. No. 15-24 at 70; *see also Ruiz*, 631 S.W.3d 841.

Petitioner even asks the Court to take judicial notice of the transcript of Ruiz's trial. Dkt. No. 26 at 31. But although Petitioner cites Ruiz's transcript, she did not provide a full

---

[11] Harmless-error analysis under *Brecht* is unnecessary where the more demanding "reasonable probability" standard applies, such as with *Brady* claims and IAC claims under *Strickland*. *Kyles*, 514 U.S. at 435–36. But it may be appropriate to conduct a *Brecht* review of claims analyzed under the "reasonable likelihood" standard for materiality. *See Barrientos v. Johnson*, 221 F.3d 741, 756–57 (5th Cir. 2000). Because the Court analyzed Petitioner's *Napue* and *Giglio* claim under the reasonable-likelihood standard, it now discusses *Brecht* out of an abundance of caution.

copy of the transcript to the Court. The record here contains only a few short excerpts from Ruiz's trial transcript, which were included with Petitioner's state habeas application. Under Federal Rule of Evidence 201, "[t]he court . . . must take judicial notice if a party requests it and the court is supplied with the necessary information." Petitioner has not supplied the Court with the necessary information here, so the Court must deny her request for judicial notice of Ruiz's trial transcript. The Court can, however, judicially notice "fact[s] . . . not subject to reasonable dispute because [they] . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Accordingly, the Court takes judicial notice of the Eleventh Court of Appeals' published opinion on Ruiz's direct appeal. *Ruiz v. State*, No. 11-18-00267-CR, 631 S.W.3d 841 (Tex.App.—Eastland, 2021).

Ruiz's attorneys had the letters between Brown, Briles, and Munk. They questioned Brown at length about the letters. Dkt. No. 15-32 at 37–40. And Brown admitted during Ruiz's trial that she was "still trying to get a deal for what [she] sent them in on Dez Mata." Dkt. No. 15-32 at 37. Ruiz's trial team also found Jerry Castillo and talked with him, developing a theory that he and Sosa committed the murders without any participation from Ruiz, Petitioner, or Juan Castillo.[12] But like Petitioner, Ruiz was convicted by a jury of two counts of capital murder and sentenced to life without the possibility of parole. *Ruiz*, 631 S.W.3d at 847. Petitioner essentially argues that her trial was unfair because Brown testified falsely, she didn't have the letters between Brown, Briles, and Munk to impeach Brown's testimony, and her counsel failed to find and interview Jerry Castillo. So she asks to be granted a new trial, with

---

[12] Ultimately, Jerry exercised his right against self-incrimination and refused to testify in Ruiz's trial. *Ruiz*, 631 S.W.3d at 857–58. Although Ruiz's investigator testified, the trial court excluded the substance of Jerry's statement to Ruiz's investigator as hearsay. *Id.*

35

access to all the information that Ruiz's attorneys had.[13] But even without the alleged *Brady*,
*Napue*, and *Strickland* violations, Ruiz ended up with the same outcome as Petitioner. For these
reasons, and those explained above, Petitioner has failed to show that any these alleged errors
had a substantial or injurious effect on the jury's verdict in her case.

**4.     Conclusion**

In sum, Petitioner's state-process claims are contradicted by the record and, in any event,
not cognizable under Section 2254. As to the remainder of her claims, Petitioner has failed to
show that the state-court's adjudication resulted in a decision contrary to clearly established
federal law or resulted in a decision based on an unreasonable determination of the facts in light
of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d). Petitioner has
also failed to identify any error that had a substantial and injurious effect on the verdict. *Brecht*,
507 U.S. at 622. For these reasons, the Court denies the petition and dismisses this civil action
with prejudice.

The Court recognizes that fairminded jurists could find this Court's assessment of
materiality, as it relates to Petitioner's claims under *Brady*, *Napue*, and *Giglio*, debatable or
wrong. Thus, the Court grants Petitioner a certificate of appealability on these claims, (Grounds
One and Four), under Rule 22 of the Federal Rules of Appellate Procedure and 28 U.S.C.
§ 2253(c). The Court denies Petitioner a certificate of appealability on her other claims because
she has failed to show that reasonable jurists would (1) find this Court's "assessment of the
constitutional claims debatable or wrong," or (2) find "it debatable whether the petition states a
valid claim of the denial of a constitutional right" and "debatable whether [this Court] was
correct in its procedural ruling." *Slack v. McDaniel,* 529 U.S. 473, 484 (2000).

---

[13] Ruiz's trial team also argued for the corroboration instruction, but the state court determined that the
instruction did not apply to Brown's testimony in Ruiz's case because he was not the one who made a
statement against interest to her in the jail facility. *Ruiz*, 631 S.W.3d at 854.

So ordered.

The Court will enter judgment accordingly.

Dated March 12, 2025.

JAMES WESLEY HENDRIX
United States District Judge

37